## DEAN·v. DEAN.

1. DIVORCE—CRUELTY—WIFE'S MISCONDUCT—HOUSEKEEPING.
   Evidence presented in suit for divorce *held,* sufficient to justify conclusion that plaintiff husband was entitled to decree of divorce in view of wife's poor housekeeping and repeated misconduct with another man.

2. SAME—CUSTODY OF CHILDREN UNDER 12—STATUTORY PREFERENCE.
   The statutory preference of the mother to the custody of minor children under the age of 12 years in suit for divorce must give way to the best interests of the children (CL 1948, § 722.541).

3. SAME—CUSTODY OF CHILDREN—MOTHER'S NEGLECT.
   Provision of decree of divorce awarding custody of 2 girls, 4 and 5 years of age, to husband is not disturbed, where it appears wife neglected the children in matters of nutrition, raiment and cleanliness (CL 1948, § 722.541).

4. SAME—AWARD OF PROPERTY TO HUSBAND—CUSTODY OF CHILDREN.
   Award to husband of all property accumulated during the marriage is affirmed, where decree of divorce and custody of children is awarded to him after wife had deserted him without just cause.

Appeal from Lapeer; Quinn (Timothy C.), J. Submitted June 9, 1955. (Docket No. 46, Calendar No. 46,437.) Decided October 3, 1955.

Bill by Jule Dean against Patricia Dean for divorce because of cruelty. Decree for plaintiff. Defendant appeals. Affirmed.

REFERENCES FOR POINTS IN HEADNOTES
[1] 17 Am Jur, Divorce and Separation § 84.
[2, 3] 17 Am Jur, Divorce and Separation § 683.
[4] 17 Am Jur, Divorce and Separation §§ 445, 446.

*Sherman McDonald,* for plaintiff.

*M. F. Wolfgang,* for defendant.

SHARPE, J.  Defendant, Patricia Dean, appeals from a decree awarding plaintiff, Jule Dean, a divorce, custody of 2 children, and a property award. The bill of complaint alleges that the parties were married October 2, 1947, at Angola, Indiana, and that as a result of said marriage 2 children were born, namely, Deanna Dean, age 5 years, and Julia Dean, age 4 years.  The bill of complaint also charges:

"(a) That on October 22, 1953, the defendant departed from her home to places unknown with the minor child, Deanna Dean, and that she has not been heard nor seen since that date.  That the defendant left the domicile of the plaintiff without his knowledge or consent, nor did he commit any act instrumental in causing the defendant to commit such desertion.  That since the date of her leaving this plaintiff has remained at home at Imlay City, Michigan and has cared for the minor child Julia Dean.

"(b) That upon information and belief your plaintiff alleges that this defendant deserted this plaintiff and minor child in order to live with another man whose name and person will be disclosed upon the trial of the matters herein.

"(c) That the defendant upon numerous occasions for several years last past has kept company with another man with whom she absconded and conducted a clandestine affair of the heart.  That during said period the defendant and her paramour planned deliberately for the time when they would abscond.

"(d) That your plaintiff believes that the defendant no longer has any love or affection for him and intends to live and cohabit with her paramour and

believes that she will not return to the State of Michigan.

"(e) That at the time of departure of the defendant the parties had accumulated a small amount of real and personal property not to exceed $3,000 in value."

The record shows that plaintiff is a pharmacist and that the parties moved to Imlay City in April of 1948. Plaintiff was employed in a drug store owned by Lawrence Dean, a cousin of plaintiff. The parties lived in a farm house owned by Lawrence Dean. The record also shows that on October 18, 1953, Lawrence Dean left Imlay City, and on or about October 22, 1953, defendant took Deanna Dean and left Imlay City for parts unknown, but before she left she wrote plaintiff a letter in which she said she was going to Alabama where her people lived.

Plaintiff testified:

"My relationships with my wife were satisfactory after we moved to Imlay City. The first occasion that I thought to the contrary was the New Year's party of 1952. Lawrence Dean, my wife and myself were drinking at my home. We are not accustomed to drinking, any of us, and we had a few drinks, and we were invited to a party in town. Upon reaching there, I felt a little giddy and laid down, and coming up I went for 'Pat.' The rest of the people at the party were all congregated in the basement, the recreation room, and she was not there, 'Pat' and Lawrence. I went outside and they were in the car with their arms about one another. I asked her what she was doing there and she said she didn't know, and he made the same answer; said some flimsy excuse he was going to take her home or something. That was all that was said about the affair at that time.

"On one other occasion, one of my little girls had a cough and I had to bring her cough medicine in 1953, and I had picked up some ice cream. I went

home unexpectedly and I looked for my wife, and at that time she wasn't around the house and the kids were locked in the room. I went to the house where Lawrence Dean was working and I asked him if she was there and he said no. He had such a funny look on his face I didn't quite believe him, and I came out of the garage and came back and caught her coming out of the back of the building. I asked what was meant by it and she told me she was looking for a dog. That was during the day. About 2 weeks before she left, I went home unexpectedly again, and the kids were again up in the hours [house?] and she was in the bedroom with the doors locked and the lights off, and they were together, and again I asked her, I just said 'what in the devil is going on', and later I apologized to Lawrence Dean. That was during the daytime. The children just had their shirts and pants on and they were in their own room with their toys in bed. &ast; &ast; &ast;

"Not only was she a poor housekeeper, the children were not dressed properly at all times, and most cases they were with just their panties on, you know, and they were locked in their room, they weren't fed at the proper time, they weren't made to go to bed at the proper time."

Mrs. Bessie Seabury, a witness for plaintiff, testified:

"Every afternoon and during the day they would be on the lawn laying down on the lawn, Lawrence and 'Pat,' and she had her sun suit on and he had shorts on and were visiting and lounging on the lawn. Well, as I say Lawrence Dean wore his T-shirt, and 'Pat' had her arms around his neck, and I have also seen her doing this to his hair, like that, and she smiled, that was all. At times the children were over playing with my little granddaughter on the bicycle, and again my little granddaughter was over there playing with their youngsters."

Mrs. Margaret Robinet, a witness for plaintiff, testified:

"I did observe Mr. Lawrence and Mrs. Patricia Dean at the home. They were sitting on the porch one time and they each had a bottle of beer and they were holding hands with one hand holding the beer with the other and the children were not around. She would, if he was out mowing the lawn, she would go out there and then he would quit mowing the lawn and they sat down on the grass and smoked cigarettes and held hands and they were dressed in shorts and halter, she was, and he had on shorts."

The trial court granted plaintiff a divorce, and in an opinion stated:

"It does appear to me that the continued course of conduct by the defendant with Lawrence Dean, even though no specific act of immorality is shown, was of such a nature that it would constitute cruelty within the definitions existing in this case.   *   *   *

"It is true in this case that much of the wrong on the part of the defendant must arise from inferences, but it appears to the court that the facts shown are sufficient so that certain inferences may properly be drawn therefrom. There has been some testimony of the defendant being found in the embrace of Lawrence Dean; there are many other actions between the parties which indicate affection, and seems to the court that over the period of time, the course of conduct between the parties as testified to, is such, when coupled with the fact that the defendant and Lawrence Dean left the community within a few days of each other and have not been seen in that community since.   *   *   *   There is ample evidence on this record for the court to award the custody of the minor children to the plaintiff, subject to the usual rights of visitation in the mother. I award the plaintiff whatever property the parties may have; that has not been detailed, merely the approximate net worth of it, but whatever it consists of it shall be the property of the plaintiff, and I will award the defendant one dollar in lieu of dower."

In our review of the record we find ample evidence to support the trial court's conclusion that plaintiff is entitled to a decree of divorce. The conduct of defendant with Lawrence Dean was not such as would create an atmosphere of harmony with her husband. It would not help but raise suspicion in his mind that defendant was defaulting on her wifely obligations.

Defendant urges that there was not sufficient evidence to overcome the statutory presumption that custody of minor children under the age of 12 years should be granted to the wife.*

We have held that the statutory preference of the mother to the custody of minor children must give way to the best interests of the children, see *Eichholtz* v. *Eichholtz,* 319 Mich 42.

Mrs. Doris Dean, a witness for plaintiff, testified:

"I did have occasion to visit them in their home from the time since they have been married. I did observe the care the children had. They were not well cared for when they were little. They run around in dirty wet diapers. Jule had to change the diapers, and 'Pat' would say, 'do it yourself,' and their hands were dirty and scaly. She kept them shut in the bedroom. She had an open pot that would have been used and she never emptied. She didn't feed them right, and she wouldn't get a meal all day. She didn't have anything but cookies. One Sunday we were up there and quite cold in the fall, a year ago, and they had little shirts and pants on, and Julia had a temperature and cold, and I said to 'Pat,' why didn't she put a bathrobe and slippers on, and she said—A little later on I wanted to go to the bathroom and Julia laid on the bathroom floor asleep and cold. I picked her up and put her in bed. I said, 'Pat, that child will be awful sick,' and she said, 'she will just lay down and sleep

---

* See CL 1948, § 722.541 (Stat Ann § 25.311).—REPORTER.

anywhere.' That is all she cared. I have a home in the city of Royal Oak at this time. We have 5 rooms in that home. There are 2 people living there now. I have space and facilities to accomodate these children in the event the children are awarded to Mr. Dean. I would be willing to take these children.

\* \* \*

"They were always dirty and always running around with no clothes on, never fed. We went up there ever since the children were born."

We have in mind that the trial court had an opportunity to see and hear the witnesses and was thus able to evaluate their testimony, plus the fact that the defendant did not appear at the hearing or offer any testimony in opposition to plaintiff's petition for a divorce. We are in agreement with the trial court relative to the custody of the children.

It is also urged that the division of the property by the trial court was inequitable. It seems to be agreed that the value of the real and personal property does not exceed the sum of $3,000. The personal property consists of certain household furniture and an automobile. The real estate consists of a part of a lot. The record does not contain any evidence as to the separate values of the personal and real property. Under the circumstances of this case we cannot say that the trial court came to the wrong conclusion in awarding all personal and real property to plaintiff.

The decree is affirmed.

CARR, C. J., and BUTZEL, SMITH, BOYLES, REID, DETHMERS, and KELLY, JJ., concurred.